N1CHOLLS, J.
The plaintiff has appealed from a judgment dismissing his suit on an exception of no cause of action. His petition is therefore copied in full.
He alleged: That Albert Breton, Felix J. Dreyfous, Adolph Grosman, Samuel B. Worms, Walter L. Saxon, W. Ratcliff Irby, and Jules A. Wogan, who all reside in New Orleans, were the promoters, commissioners, or committeemen, or organization committee and organizers of the German American National Bank, in New Orleans, with a capital of $1,000,000, and a surplus of $500,000. That he was solicited by Jules E. Wogan and others, acting in behalf of and with the authority of said promoters, to subscribe for a considerable amount of the capital stock of said bank, and he authorized the said Jules A. Wogan to subscribe for petitioner $50,000, of the stock on the 30th of June, 1905. Early in July, 1905, he received the following addressed to petitioner:
“German American National Bank.
“P. O. Box 653. Capital $1,000,000.
“Surplus $ 500,000.
“Dear Sir: Referring to your application
for stock in. the above bank, we shall thank you to fill and sign the inclosed slip and return it by first mail to the undersigned.
“Thanking you for your prompt attention, we remain
“Very truly yours,
“Albert Breton,
“F. J. Dreyfous.”
Original annexed and made part of this petition.
The “inclosed slip” was attached by a perforated line, and was as follows:
“Kindly place on the subscription list of the German American National Bank my name for --- share at the price of one hundred and fifty dollars per shares being one hundred dollars (100) par value and fifty dollars (50) surplus, subject to allotment by the organization committee.
“I bind myself to pay for this stock on the call of the organizers.”
Petitioner immediately filled in the blank, with 100 subscribing for 100 shares, signed it, and returned it by first mail to the persons who signed the above, and thereby petitioner became irrevocably bound to take and pay for 100 shares at $150 per share of the par-value of $100 per share, and has always been ready, able, and willing to pay the said $15,000 in cash on the call of the organizers.
Petitioner further shows: That said Albert Breton and Felix J. Dreyfous were then and there acting with the authority of the said promoters and organization commitee, and they and the whole committee were *759 thereby under their reciprocal obligation to allot and deliver to petitioner the said 100 shares.
That he was among the first subscribers, and did subscribe before the list was complete, and the said organization committee were in law, morals, and good conscience bound to allot the stock in the order in which subscriptions were made, and at the time when petitioner subscribed for 100 shares there were less than 9,000 shares subscribed, and, in the alternative should the court hold that the rule “first come first served” should not apply, then they were bound to deliver to each subscriber his pro rata share, there was no equitable allotment.
The said committeemen or organizers, or organization committee above named, when they met and realized the demand for the stock, and that it could be immediately sold for $240 a share, in bad faith, and not doing to others as they would be done by, and when so occupying a relation of trust and confidence to the subscribers to the stock, wrongfully and illegally allotted and appropriated the entire $1,000,000 par value of stock to themselves, members of their families, and particular friends, who had not previously subscribed, and allotted to themselves blocks of stock in excess of their previous subscriptions, and so repudiated the contract with petitioner to deliver to him 100 shares for $15,000, and the said bank has now been organized and petitioner wrongly shut out. If said stock had been delivered to him, he could have sold it for $240 a share, or for $24,000, and realized a profit of $9,000, in which sum he has been damaged by the illegal action of said organizers.
Petitioner has made amicable demands for the 100 shares of stock in vain.
In view of the premises, petitioner prays that Felix J. Dreyfous, Albert Breton, Adolph Grosman, Samuel E. Worms, Walter L. Saxon, W. Ratcliff Irby, and Jules A. Wogan be cited to appear and be condemned in solido to deliver to petitioner 100 shares of the capital stock of the German American National Bank on his paying to them $15,000-, and, in default thereof, be condemned to pay petitioner $9,000 with 5 per cent, interest from judicial demand and costs, and, in the alternative, to deliver to him such a pro-, portion of the number of shares of stock as the number subscribed for by him (100) bore to the whole number subscribed for in good faith and before the meeting of the organization committee, and in default thereof to pay him (90) per share and for general relief.
The only authority cited by plaintiff is an extract from the opinion in the case of Meade v. Walker, 1 Hopk. Oh. (N. Y.) 587.
The syllabus of the brief of the defendants is as follows:
“(1) The allegation that plaintiff was solicited by defendants to subscribe for a ‘considerable amount’ of the capital stock of the bank, and that on June 30, Í905, he authorized one of the defendants to subscribe for him for $50,000 worth of the stock, does not state a cause of action, among other reasons, because the petition shows that, when plaintiff was invited, in July next to put his application for stock in writing, he disregarded his previous application, correctly treating it as not binding, and applying for only 100 shares.
“(2) We start fresh, then, with a request by plaintiff to be placed on the subscription list of the bank for 100 shares. It is not alleged or claimed that this offer was ever accepted, expressly or otherwise. The authorities are unanimous to the effect that an offer or application to take stock in a corporation being organized creates no obligation until accepted by the person to whom addressed. Before acceptance the appellant is free to withdraw his offer. Until accepted, the person to whom it is addressed is under no obligation whatever to accede to the request and allot the stock applied for or any part thereof. See authorities cited in brief.
“(3) The rights which plaintiff seeks to enforce are, moreover, wholly wanting in definiteness and certainty. Allotment or apportionment of stock in a corporation being organized has no fixed meaning in law. There is no authority holding that the words mean distribution of the stock in the order in which the applications happen to come in. There is no authority for the contention that they mean a pro rata distribution in the proportion which . *761 the amount applied for in each case bears to the total amount of the stock to be issued. In the absence of a statute taking away from the organizers of a corporation all discretion in the premises, they are free to allot stock in their enterprise as they see fit. The mere fact that they invite the public to make bids on applications for stock does not make such an application or bid, when made, a completed contract of subscription. Especially is this so when each applicant is free to apply for as many shares as he chooses, to the extent of the whole issue.”
In support of these propositions, counsel cite:
9 Cyc. p. 278-279; Morawetz on Corporations, vol. 1, §§ 44, 46. 49, 50, 62, 63, 66, 70; Elliott on Private Corporations, § 365.
Taylor on Private Corporations, § 72.
(1) In re Richmond Hill Co., Pellot’s Case, L. R. 2 Ch. App. 527-534.
(2) In re National Savings Bank Association, Hebbs’ Case [1867] 4 Eq. 8.
(3) In re Universal Banking Co., Gunn’s Case [1867] L. R. 3 Ch. App. 40.
(4) Tothill’s Case [1865] 1 Ch. App. 84-88.
(5) Ramsgate Hotel Co. v. Montefiori, L. R. 1 Exch. 109.
(6) Ritso’s Case, 4 Ch. Div. 774-782.
(7) Rawlins & Maenaghton on Companies, 613, note 1.
It appears from plaintiff’s petition that the parties who first communicated with him with reference to subscription to stock were mere solicitors. Jules A. Wogan was the only person named in that connection. It is not claimed that they were themselves authorized to receive and close with parties for subscriptions, or to bind' either plaintiff or the promoters. All that they did was to call plaintiff’s attention to the proposed organization, and solicit his favorable consideration of it. Plaintiff alleges that he on the 30th of June, 1905, authorized Wogan to “subscribe” for him for $15,000 of the stock, but Wogan is not represented as having consented to act for him, or as having attempted or succeeded in doing so.
Inferentially Wogan himself or some of the solicitors must have communicated to the promoters plaintiff’s willingness to subscribe, as, without apparently any further communication, he received a letter from Breton and Dreyfous on that subject. The fact of soliciting subscriptions imposed upon these parties no legal obligation. That plaintiff did not consider Wogan’s action was an offer made by the promoters that he should take stock, which offer would cause the subsequent letter that he wrote to become, when written, an “acceptance” of a proposition to. him creating at once a “contract,” is evident.
Wogan did not solicit the subscription by plaintiff of any specific amount of stock. The latter could later, after the interview, either decline to take any further action whatever in the matter, or he might himself “offer” to take one or five or any other number of shares which his own discretion would suggest. The sending back to Breton and Dreyfous of the slip which they had sent to plaintiff after the latter had filled it up with the number “one hundred” written therein, as indicative of the number of shares which he desired to take, was certainly not responsive to any particular proposition which had been made to him to subscribe. Article 1805 of the Civil Code requires that the acceptance to form a contract must be in all things conformable to-the offer. Any condition or limitation contained in the acceptance of that which formed the offer gives him who makes the-offer the right to withdraw it.
There had been when he filled up the slip no offer to him to take 100 shares of stock. The letter of Breton and Dreyfous to plaintiff referred to his application to take stock, and the slip which was to be returned was undoubtedly such. Under the circumstances, of this case the slip must be considered as the initial step looking to the creation of a future contract. It was a proffered offer *763 of subscription made by the plaintiff to the promoters, which, even if accepted, would be subject to allotment by the organization committee. The whole subject-matter of the correspondence was conditional and contingent. The xjlaintiff was at liberty to withdraw his application until notified that it had been accepted, and the promoters, after it had been submitted to them for action, were at liberty to decline it.
A mere application or offer to subscribe carries with it no obligation on the part of the person to whom it is made to grant it. The promoters in this case had not in advance of the application bound themselves to accept it if, and when, made. There is no allegation or claim that they had done so.
The slip, when returned to Breton and Dreyfous, was not in itself and by itself a subscription, but retained its character as an application. The promoters were not as such acting as agents for any party under delegated powers conferred upon them as to subscriptions for stock, but as the original parties or principals in the matter they were dealing with. They were free to take such action in the premises as in their view and judgment would best promote the success of the object they had in view. Article 1798 of the Civil Code declares that:
“As there must be two parties to every contract, so there must be something proposed by one and accepted and agreed to by another to form the matter of such contract; the will of both parties must unite on the same point.”
Taylor in his work on Private Corporations, § 2, uses the following language:
“A general remark may be premised in regard to_ the group of topics under consideration in this and in succeeding chapters: Incorporation not having as yet taken place, the rules of law in the constitution of the corporation are not yet in operation, and ‘corporation law’ as such, will, usually, be found inapplicable. Consequently the various rights and liabilities arising through the promotion of the corporation will be determinable in accordance with the general principles of the law of contract, of agency, and of partnership. 'We are, for the most part, dealing with contracts made by certain persons with certain others, which, to be sure, have some ulterior end in view, as contracts usually have; but the fact that this ulterior end is the incorporation of a company does not necessarily affect the rules of law by which these contracts are to be regulated, and the relations arising from them determined.”
Defendant quotes Lord Cairns, L. J., lay'ing down tbe principle in Re Richmond Hill Co., Pellot’s Case, L. R. 2 Cb. App. 527-534, that “where an individual applies for shares in a company, there being no obligation to let him have any, there must be a response by the company, otherwise there is no contract,” and quotes the syllabus of In re National Savings Bank Association, Hebbs’ Case [1867] 4 Eq. 8, to the effect that “a proposed contract is not binding on the party who proposes it until its acceptance by the other party has been communicated to him or his agent.” H. applied in writing for 10 shares in a company and the directors allotted to him 10 shares. After the allotment, but before it was communicated to H., he withdrew his application. Held that he did not agree to accept the shares.
In the Matter of the Universal Banking Co., Gunn’s Case, L. R. 3 Ch. App. 40, Sir John Robb, L. J., is reported as saying:
“There must be the consent of two parties to a contract. One man may make an offer to another and say, ‘I agree to buy your estate,’ but the person to whom he has made the offer must say, T agree to sell you the estate’, or he must do something equivalent to an acceptance — something which satisfies the court, either by words or conduct, that the offer has been accepted to the knowledge of the person who made the offer. I think that is requisite in the case of an application for shares just as in the case of any other contract:”
In Morawetz (volume 1) the writer says:
“Every element which is essential in the nature of things to the existence of a contract must, of course, be present in the contract of membership in a corporation. There must be contracting parties, and those parties must by their mutual agreement create an obligation between them. Without these elements no true contract is possible.” Section 44.
*765 “An offer to become a shareholder when accepted by and .on behalf of the other members •of the company constitutes the offerer a shareholder. Thus when an allotment of shares is required before an applicant becomes a shareholder, an application for shares is a mere offer and the offer ripens into a contract as soon as the allotment has been made and notice thereof sent to the applicant.” Section 46.
“An offer to become a shareholder in a corporation to be formed thereafter, may undoubtedly be revoked at any time before acceptance, whether the offer accompany a contract to take shares or not. But a mutual agreement to become shareholders, or to subscribe for shares is binding between the parties as a contract and •cannot be revoked.” Section 50.
“It is clear that the contract of membership in a corporation, like any other contract, cannot be created without mutual consent of the parties.” Section 62.
We are of the opinion that there is nothing in the plaintiff’s petition which would entitle him to a judgment against the defendant as prayed for. The judgment appealed from is therefore affirmed.